RONNIE SUBER,                          )
BONGAI MHLOYI, and                     )
JEREMIAH MHLOYI,                       )
  Individually, and                    )
  together doing                       )
  business as "JB'S WEB",              )
                                       )
            Plaintiff                  )        Civil Action
                                       )        No. 10-cv-03156
      vs.                              )
                                       )
JON GUINTA;                            )
OFFICER KEUCH;                         )
OFFICER INGEMIE;                       )
OFFICER MILLER;                        )
OFFICER SIMPKINS; and                  )
THE CITY OF COATESVILLE,               )
                                       )
            Defendants                 )

                    *       *       *


APPEARANCES:

            DON BAILEY, ESQUIRE
                  On behalf of Plaintiffs

            GARY H. DADAMO, ESQUIRE
                  On behalf of Defendants, Officer Robert Keuch,
                  Officer Jeffrey J. Ingemie, Officer Shannon N.
                  Miller, Officer Claude Simpkins, and The City of
                  Coatesville

                    *       *       *

                    **O P I N I O N**

JAMES KNOLL GARDNER,
United States District Judge

            This matter is before the court on the Motion for

Summary Judgment of Officer Robert Keuch, Officer Jeffrey J.

Ingemie, Officer Shannon N. Miller, Officer Claude Simpkins, and

The City of Coatesville, Pennsylvania filed November 26, 2012.[1]

On January 3, 2013, Plaintiffs' Brief in Opposition to

Defendants['] Motion for Summary Judgment was filed.[2]

## SUMMARY OF DECISION

For the reasons expressed below, I grant the Motion for

Summary Judgment and enter judgment in favor of defendants

Officer Robert Keuch, Officer Jeffrey J. Ingemie, Officer

Shannon N. Miller, Officer Claude Simpkins, and The City of

Coatesville (together, the "moving defendants"), and against

plaintiffs Bongai Mhloyi and Jeremiah Mhloyi (together, the

"Mhloyis" or "Mhloyi plaintiffs") .

Specifically, I grant the Motion for Summary Judgment

and enter judgment in favor of defendants Officer Robert Keuch,

Officer Jeffrey J. Ingemie, Officer Shannon N. Miller, and

Officer Claude Simpkins (together, the "Officer defendants")

because the Mhlohi plaintiffs fail to provide sufficient record

evidence to allow a reasonable factfinder to conclude that any of

---

[1]     The Motion for Summary Judgment was filed together with (1) Brief
in Support of Motion for Summary Judgment of Officer Robert Keuch, Officer
Jeffrey J. Ingemie, Officer Shannon N. Miller, Officer Claude Simpkins, and
The City of Coatesville (Document 32-2)("Defendants' Brief"); (2) the Concise
Statement of Material Undisputed Facts of Defendants Keuch, Ingemie, Miller,
Simpkins, and The City of Coatesville (Document 33)("Defendants' Statement of
Facts"); and (3) Defendants' Exhibits A-P (Documents 34-1 through 34-16) in
support of the Motion for Summary Judgment.

[2]     Plaintiffs' Brief was filed together with (1) Plaintiff[s']
Counterstatement of Disputed Material Facts (Document 40)("Plaintiffs'
Counterstatment of Facts"); and (2) Plaintiffs' Exhibits A-J (Documents 40-2
through 40-8) in support of Plaintiffs' Brief and Plaintiffs' Counterstatement
of Facts.

the Officer defendants treated the Mhloyis, or JB's Web, differently than others similarly situated, and that the Officer defendants did so because the Mhloyis, and the patrons of JB's Web, are African-American.

Additionally, I grant the Motion for Summary Judgment and enter judgment in favor of defendant The City of Coatesville (the "City") and against the Mhloyi plaintiffs because the Mhloyis have not produced record evidence which would permit a rational factfinder to conclude either that the City had an official policy of selective enforcement toward the Mhloyis, or JB's Web, or that a municipal decisionmaker or policymaker had knowledge of, and acquiesced to, a common practice of selective enforcement toward the Mhloyis, or JB's Web.

As the result of this ruling, the only parties remaining in this lawsuit are plaintiff Ronnie Suber, the manager of JB's Web, and defendant Jon Guinta, a Chester County Probation Officer.

## **JURISDICTION**

Jurisdiction in this case is based upon federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

## **VENUE**

Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to plaintiffs' claims allegedly occurred

in the City of Coatesville, Chester County, Pennsylvania, which is located within this judicial district.

**PROCEDURAL HISTORY**

Plaintiffs Ronnie Suber, Bongai Mhloyi and Jeremiah Mhloyi initiated this action on June 30, 2010 by filing a two-count Complaint against defendant Officers James A. Pinto, III, Ryan L. Wright, Robert Keuch, Jeffrey J. Ingemie, Shannon N. Miller and Claude Simpkins; defendant The City of Coatesville; and one defendant John Doe.

Defendant Officers Pinto, Wright, Keuch, Ingemie, Miller, Simpkins and The City of Coatesville filed a motion to dismiss plaintiffs' Complaint on August 26, 2010. In response, plaintiffs filed an Amended Complaint on September 17, 2010, which omitted defendant John Doe and replaced him with defendant Jon Guinta.

Defendant Officers Pinto, Wright, Keuch, Ingemie, Miller, and Simpkins, and The City of Coatesville, filed a motion to dismiss the Amended Complaint or, alternatively, for a more definite statement concerning Count II of the Amended Complaint on September 23, 2010.

By Order dated August 8, 2011 and filed August 9, 2011, I granted the alternative motion for a more definite statement. Plaintiffs filed their Second Amended Complaint on October 3, 2010, and re-filed the same document on October 12, 2011. Offi-

cer Pinto was not named as a defendant in the Second Amended Complaint and was, therefore, terminated from this action.

On October 17, 2011 defendant Officers Wright, Keuch, Ingemie, Miller, Simpkins, Pinto (despite having been omitted from the Second Amended Complaint), and The City of Coatesville filed a motion to dismiss plaintiffs' Second Amended Complaint. Plaintiffs filed their response in opposition to that motion on November 2, 2011.

By Order and accompanying Opinion dated and filed September 28, 2012, I granted in part, and denied in part, the motion to dismiss the Second Amended Complaint.

As a result of my September 28, 2012 Order and accompanying Opinion, the only claims remaining in the Second Amended Complaint are the claims of plaintiff Ronnie Suber in Count I against defendant Jon Guinta for violation of plaintiff Suber's First, Fourth, and Fourteenth Amendment rights, brought pursuant to 42 U.S.C. §§ 1983 and 1985; and the claims of plaintiffs Bongai Mhloyi and Jeremiah Mhloyi against defendant Officers Keuch, Ingemie, Miller, and Simpkins, and defendant The City of Coatesville for violation of the Mhloyi plaintiffs' Fourteenth Amendment rights to equal protection of the law, brought pursuant to 42 U.S.C. § 1983. The Mhloyis' equal protection claims are the subject of the Motion for Summary Judgment now before the court.

On November 26, 2012, the Motion for Summary Judgment of Officer Robert Keuch, Officer Jeffrey J. Ingemie, Officer Shannon N. Miller, Officer Claude Simpkins, and The City of Coatesville was filed.  On January 3, 2013, Plaintiffs' Brief in Opposition to Defendants['] Motion for Summary Judgment was filed.  Oral argument on the within motion was held before me on February 13, 2013.  At the conclusion of oral argument, I took the motion under advisement.  Hence this Opinion.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure permits a party to seek summary judgment with respect to a claim of defense, or part of a claim of defense.  Rule 56(a) provides, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); <u>National Association for the Advancement of Colored People "NAACP" v. North Hudson Regional Fire & Rescue</u>, 665 F.3d 464, 475 (3d Cir. 2012).

For a fact to be considered material, it "must have the potential to alter the outcome of the case."  <u>Id.</u> (citing <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006)).  Disputes concerning facts which are irrelevant or unnecessary do not preclude the district court from granting summary judgment.  <u>Id.</u>

Where a party asserts that a particular fact is, or cannot be, genuinely disputed, the party must provide support for its assertion. Fed.R.Civ.P. 56(c)(1). Rule 56(c)(1) provides that party may support its factual assertions by

> (A) citing particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

When considering a motion for summary judgment, the district court must view the facts and record evidence presented "in the light most favorable to the non[-]moving party." North Hudson, 665 F.3d at 475 (quoting Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

If the moving party shows that there is no genuine issue of fact for trial, "the non-moving party then bears the burden of identifying evidence that creates a genuine dispute regarding material facts." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Where a defendant seeks summary judgment, the plaintiff cannot avert summary judgment with speculation, or by resting on the allegations in his pleadings, but rather he must present

competent evidence from which a jury could reasonably find in his favor.  Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir 1999); Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa. 1995)(Reed, J.).

"Ultimately, [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Id. (quoting Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotations omitted and alteration in original).

## FACTS

Upon consideration of the pleadings, record papers, exhibits, and depositions, and drawing all reasonable inferences in favor of plaintiffs as required by the forgoing standard of review, the pertinent facts are as follows.

### Background

Plaintiffs Bongai Mhloyi and Jeremiah Mhloyi are married and own a bar, called JB's Web.[3]  JB's Web is located on East Lincoln Highway, the "main drag" in Coatesville, Chester County, Pennsylvania.[4]

---

[3]    Plaintiffs' Exhibit D, Transcript of Videotape Deposition of Bongai Mhloyi taken November 7, 2011 (Document 40-5)("Bongai Deposition") at page 6.

[4]    Plaintiffs' Exhibit A, Transcript of Videotape Deposition of Ronnie Suber taken November 7, 2011 (Document 40-2)("Suber Deposition") at page 17.

The Mhloyis purchased JB's Web, which was previously
called West Side Tavern, in 2005.[5] Prior to the Mhloyis' acqui-
sition of the bar, it had a Caucasian owner and a predominantly
Caucasian clientele.[6] The Mhloyis are African-American. The
patrons of JB's Web are predominantly African-American.[7]

Coatesville's Polish Club is located across the road
from JB's Web. The membership of the Polish Club is predomi-
nantly Caucasian and includes officers, and the chief, of the
City's police department.[8]

JB's Web is open to the public at large, whereas the
the Polish Club is a private club not open to the public.[9]

Coatesville police officers abide by an informal
practice of permitting private clubs -- such as the Polish Club,
the VFW, and the Motorcycle Club -- to handle their own internal
security.[10] In other words, Coatesville police officers conduct

---

[5]     Bongai Deposition at pages 6 and 37.

[6]     Plaintiffs' Exhibit B, Transcript of Videotape Deposition of
Jeremiah Mhloyi taken November 7, 2011 (Document 40-3)("Jeremiah Deposition")
at page 30.

[7]     Defendants' Statement of Facts at ¶ 1; Plaintiffs'
Counterstatement of Facts at ¶ 1.

[8]     See Bongai Deposition at pages 22-23.

[9]     Suber Deposition at page 57.

[10]    The Mhloyis do not argue, and the record evidence does not support
a reasonable inference, that the walk-through bar-check practice is executed
in a racially discriminatory manner. The record evidence, uncontradicted by
plaintiffs, is that members of the Coatesville police department do periodic
walk-through checks of all of the public bars in the City, but not of the
private clubs (including the Polish Club, with its Caucasian clientele, and
the VFW, with its African-American clientele).

periodic "bar checks" of public bars, during which an officer walks through the establishment. By contrast, Coatesville police officers do not conduct walk-through bar checks of private clubs.

"Citations" are documents which can be issued against an establishment, such as JB's Web, for alleged violations of a local ordinance, such as a noise ordinance. If a citation is issued to an establishment, that establishment can contest the citation in court. By contrast, "Incident Investigation Reports" are documents prepared by Coatesville police officers to record investigative actions taken by the police, regardless of whether a citation is issued or an arrest is made.[11]

Pennsylvania Nuisance Bar Program

According to the Pennsylvania Liquor Control Board ("LCB"), the LCB established the state's Nuisance Bar Program in January, 1990.[12] Under the Nuisance Bar Program, the operational record of a licensed establishment, such as JB's Web, is reviewed by the LCB to determine whether, or not, to renew the establishment's license. According to the LCB,

> [t]he program [seeks] response from the community and various enforcement and government jurisdictions to report any adverse activity which

---

[11]    See Defendants' Exhibit D, Coatesville Police Department Incident Investigation Report No. 20080409M3844(01) completed by Detective Ryan Wright on April 9, 2008 at pages 1-2 (recording activity and indicating that a citation will be issued subsequently and separately).

[12]    Pennsylvania Liquor Control Board, Nuisance Bar Program, *available at* http://www.lcb.state.pa.us/PLCB/Licensees/NuisanceBarProgram/index.htm (last visited January 16, 2013).

> [occurred] via the licensed establishment. These
> reported licensees' records [are] reviewed to
> determine whether the Board [will] issue a renewal
> of the license for the new term.
>
> ....
>
> The licensee must continue to meet all statutory
> requirements, and the Bureau of Licensing must
> determine if the licensee, by its record, has
> abused the license privilege. The Board, in
> fulfilling its mandate to protect the health and
> welfare of the community, established the Nuisance
> Bar Program.
>
> ....
>
> The Nuisance Bar Program is successful in that it
> has established coalitions among a variety of
> police and government agencies to bring to bear
> all legal leverage to abate the nuisance and offer
> timely relief to the community. The program has
> been able to deny licensed authority to the
> establishments at times when the various police or
> government powers have been unable to do so.[13]

The Pennsylvania State Police Bureau of Liquor Control
Enforcement ("BLCE") conducts "Nuisance Bar Investigations",
which the BLCE describes as "[i]nvestigations of a licensed
establishment that is operated...in such a manner that a disre-
gard for the sensibilities of a surrounding area is manifes-
ted."[14] BLCE nuisance bar investigations seek to determine
whether a licensed establishment's "operation continually endan-
gers the life and health of patrons and residents, offends the

---

[13]        Pennsylvania Liquor Control Board, Nuisance Bar Program,
*available at* http://www.lcb.state.pa.us/PLCB/Licensees/NuisanceBarProgram/
index.htm (last visited January 16, 2013).

[14]        Pennsylvania State Police, Liquor Control Enforcement[:] Nuisance
Bars, *available at* http://www.lce.state.pa.us/portal/server.pt/community/
hide_-_ liquor_control_enforcement/5900/types_of_enforcement/501465 (last
visited January 16, 2013).

senses, violates the laws of decency, and obstructs the reasonable and comfortable use of property in its vicinity."[15]

Pursuant to Pennsylvania's Liquor Code,[16] the LCB may refuse a properly-filed license renewal application "due to the manner in which this...licensed premises was operated while the licensee, its shareholders, directors, officers, association members, servants, agents or employees were involved with that license."  47 P.S. § 4-470(a.1)(4).  Moreover, the Liquor Code provides that

> [w]hen considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated.

Id. (emphasis added).

The Mhloyis' business has been negatively affected by both citations and Incident Investigation Reports because the LCB has received copies of both citations (even where the citation was dismissed when challenged in court) and Incident Investi-

---

[15]    Pennsylvania State Police, Liquor Control Enforcement[:] Nuisance Bars, *available at* http://www.lce.state.pa.us/portal/server.pt/community/ hide_-_ liquor_control_enforcement/5900/types_of_enforcement/501465 (last visited January 16, 2013).

[16]    Act of April 12, 1951, P.L. 90, art. I, § 101 - art. X, § 1001, as amended, 47 P.S. §§ 1-101 through 10-1001.

gation Reports (where no citation was issued to JB's Web) from the Coatesville police department.[17]

Citations

JB's Web plays music, which is common among the bars and private clubs in Coatesville. The noise level of the music at JB's Web is not any higher than other establishments in Coatesville.[18]

The Polish Club across the road from JB's Web produces more noise than JB's Web, but Ronnie Suber, who is the full-time bar manager at JB's Web, has never seen a police officer respond to noise coming from the Polish Club.[19]

Officer Wright of the Coatesville police department issued a noise-ordinance citation against JB's Web for excessive noise on April 9, 2008.

Officer Claude Simpkins never wrote any noise-ordinance citations against JB's Web.[20]

All of the unspecified number of noise-ordinance citations issued to JB's Web were "thrown out" when challenged by

---

[17]    Jeremiah Deposition at pages 22-23.

[18]    Plaintiffs' Exhibit E, Transcript of Videotape Deposition of [Officer] Claude Simpkins taken March 31, 2011 (Document 40-6)("Simpkins Deposition") at page 11.

[19]    Suber Deposition at pages 8-9, and 80.

[20]    Simpkins Deposition at page 10; Defendants' Statement of Facts at ¶ 29; Plaintiffs' Counterstatement of Facts at ¶ 29.

JB's Web in court.[21]  The citations issued by Coatesville police officers were sent to the LCB even when those citations had already been dismissed by the local courts: "[the citations] go to the Liquor Control Board and [JB's Web has] to fight [the citations] to explain...that the citations were thrown out one after another, after another, after another."[22]

Bongai Mhloyi has never been accused of, and JB's Web has never been cited for, "selling liquor to underage kids" or any "drug activity".[23]

<u>Incident Investigation Reports</u>

If an incident occurs outside on the street, rather than inside JB's Web, the Incident Investigation Report (IIR) is written up in such a way that the incident is attributed to JB's Web rather than the Polish Club located across the street from JB's Web.[24]

The Coatesville police department sent Incident Investigation Reports to the LCB reporting incidents which were allegedly related to JB's Web, even when no citation has been issued against JB's Web based upon the reported incident.[25]

---

[21]     Suber Deposition at page 77.

[22]     Bongai Deposition at page 48.

[23]     <u>Id.</u> at page 99.

[24]     <u>Id.</u> at page 24.

[25]     Jeremiah Deposition at pages 34-36.

The Coatesville police department was not supposed to report JB's Web to the LCB unless the bar is found guilty of an ordinance violation.  Nonetheless, the Coatesville police department sent Incident Investigation Reports implicating JB's Web (but which did not result in a citation to JB's Web) to the LCB.[26]

On one occasion, a person was drinking on the street near his or her home (located near both JB's Web and the Polish Club) and a Coatesville police officer issued a citation to JB's Web and not to the Polish Club.[27]

### Specific Incident Reports

On five occasions during 2005 and 2006 -- specifically, August 20 and September 10, 2005, and January 18, February 3, and April 23, 2006 -- Coatesville police officers responded to noise complaints from Mona Lisa London about JB's Web.[28]  The Coates-

---

[26]    Id.  None of the parties have produced record evidence concerning (1) who, specifically, sent the Incident Investigation Reports to the state board; and (2) whether all Incident Investigation Reports concerning or relating to a liquor-licensed establishment are sent to the state board, and if so, (a) whether, or not, the reports are sent (a) pursuant to Coatesville police policy or practice, or (b) pursuant to state statute or regulation.

[27]    Bongai Deposition at page 25.

[28]    Defendants' Exhibit N, Incident reports involving noise complaints from Mona Lisa London, specifically,(A) Coatesville Police Department Incident Investigation Report No. 20050820M2711(01) completed by Officer Joseph Carboni on August 20, 2005 at pages 1-2; (B) Coatesville Police Department Incident Investigation Report No. 20050910M3953(01) completed by Corporal Sean Knapp on September 10, 2005 at pages 1-2; (C) Coatesville Police Department Incident Investigation Report No. 20060118M0993(01) completed by Officer Guy Bruchstein on January 18, 2006 at pages 1-2; (D) Coatesville Police Department Incident Investigation Report No. 20060203M1671(01) completed by Officer James Audette on February 3, 2006 at pages 1-2; (E) Coatesville Police Department Incident

(Footnote 28 continued):

ville police department did not issue any citations against JB's Web based upon these complaints from Ms. London.  However, Incident Investigation Reports were created for each of those complaints by Ms. London.[29]

Specifically, the August 20, 2005 IIR completed by Officer Joseph Carboni states that Officer Carboni was dispatched twice to JB's Web in response to noise complaints from Ms. London.  The IIR indicates that Officer Carboni spoke to Levon Higgins, who was working at JB's Web, and that the music was turned down on both occasions.[30]

The September 10, 2005 IIR completed by Officer Sean Knapp states that he was dispatched to JB's Web to respond to a complaint from Ms. London that the music was too loud.  The IIR states that Officer Knapp informed the bar of the complaint and that the  bar agreed to turn down the volume of the music.  Officer Knapp did not issue a noise citation against JB's Web based upon this incident.[31]

_____

(Continuation of footnote 28):

Investigation Report No. 20060203M1670(01) completed by Officer James Audette on February 3, 2006 at pages 1-2; and (F) Coatesville Police Department Incident Investigation Report No. 20060423M5661(01) completed by Officer James Audette on April 23, 2006 at pages 1-2.

[29]    See Footnote 28, supra; Defendants' Statement of Material Facts at ¶¶ 18-19; Plaintiffs' Counterstatement of Facts at ¶¶ 18-19.

[30]    IIR No. 20050820M2711(01) at pages 1-2.

[31]    IIR No. 20050910M3953(01) at page 2.

The January 18, 2006 IIR completed by Officer Guy
Bruchstein states that he was dispatched to JB's Web to respond
to a noise complaint from Ms. London that the music at JB's Web
was too loud.  The IIR states that Officer Bruchstein advised the
employees of JB's Web to keep the volume of the noise and music
down.  Officer Bruchstein did not issue a noise citation against
JB's Web as a result of this incident.[32]

The two February 3, 2006 IIRs completed by Officer
James Audette state that he was in the area and responded to
noise complaints concerning JB's Web from Ms. London.  The IIRs
state music could be heard coming from inside the bar, but that
"it was not excessively loud" and "nowhere near the volume level
to shake the walls of surrounding residences."  Officer Audette
did not issue a citation against JB's Web based upon these noise
complaints from Ms. London because he determined they were
"unfounded".[33]

The April 23, 2006 IIR completed by Officer James
Audette states that he responded to another noise complaint from
Ms. London concerning JB's Web.  The IIR states that he advised
the bartender to turn the music down.  Officer Audette did not
issue a citation against JB's Web based upon this incident.[34]

---

[32]    IIR No. 20060118M0993(01) at pages 1-2.

[33]    IIR No. 20060203M1671(01) at pages 1-2; IIR No. 20060203M1670(01)
at pages 1-2.

[34]    IIR No. 20060423M5661(01) at pages 1-2.

Officer Ingemie completed an IIR on September 27, 2007 after he conducted a "park and walk" near JB's Web on that date. The IIR states that Officer Ingemie requested that JB's Web turn down its music and close the door of the bar. The IIR states that Officer Ingemie informed the bar that if he had to return to the bar, it would be cited.[35] Although the IIR does not indicate that any citation was issued to JB's Web concerning this incident, Officer Ingemie supplemented the IIR on September 2, 2009, noting that he testified at an August 31, 2009 LCB hearing concerning JB's Web.[36]

On March 20, 2008, Officer Brandon Harris completed an IIR after being dispatched to JB's Web. The IIR states that Officer Harris spoke with Ms. Nicole Bender, who was bartending at JB's Web and who had a laceration on her face. Ms. Bolder told Officer Harris that Mona Lisa London, a patron of JB's Web, threw her drink in Ms. Bolder's face and then ran behind the bar and attempted to attack Ms. Bolder. Ms. Bolder then grabbed Ms. London and escorted her out of JB's Web. Officer Harris observed the incident on the bar's video surveillance system,

---

[35]     Defendants' Exhibit B, Coatesville Police Department Incident Investigation Report No. 20070927M2698(01) completed by defendant Officer Jeffrey Ingemie on September 27, 2009 at page 1.

[36]     Id. at pages 1-2.

took a written statement from Ms. Bolder, and cited Ms. London for disorderly conduct.[37]

On April 9, 2008, Officer Ryan Wright was patrolling in the area West Lincoln Highway and Mount Pleasant Streets in Coatesville. Officer Wright completed an IIR which states that he heard loud music coming from JB's Web while he was stopped in traffic approximately one block away from the bar. Officer Wright issued a citation to JB's Web for violating Coatesville's noise ordinance.[38]

On May 9, 2008, defendant Officer Shannon N. Miller was dispatched to respond to a theft outside of JB's Web. Officer Miller completed an IIR which states that Mr. Zachariah Davis was unloading a delivery of beer to JB's Web. Mr. Davis told Officer Miller that as he was returning to his delivery truck from the basement of JB's Web, he saw a man reach into the truck and remove two six-packs of beer, get into a vehicle with three other individuals and drive off.[39]

On May 14, 2008, Detective Kevin Campbell, assisted by Corporal Jonathan Regan, Sergeant Brandon Harris, defendant

[37]    Defendants' Exhibit C, Coatesville Police Department Incident Investigation Report No. 20080327M3234(01) completed by Sergeant Brandon Harris on March 20, 2008 at pages 1-2.

[38]    Defendants' Exhibit D, Coatesville Police Department Incident Investigation Report No. 20080409M3844(01) completed by Detective Ryan Wright on April 9, 2008 at pages 1-2.

[39]    Defendants' Exhibit F, Coatesville Police Department Incident Investigation Report No. 20080509M5182(01) completed by defendant Shannon N. Miller on May 9, 2008 at pages 1-2.

Officer Claude Simpkins, and Corporal Ken Michels were dispatched
to respond to a fight involving several individuals near or in
JB's Web.[40]  The IIR prepared for this incident states that when
the police arrived, they found a man down the block from JB's Web
who had been cut and whose face was bleeding and that there was a
blood trail leading from the sidewalk in front of JB's Web to
where the injured man was found.[41]

Officer Simpkins arrested the injured man, who had five
open warrants (two bench warrants and three traffic warrants),
and the man was transported to the hospital for treatment of his
injuries.[42]  The case was closed on October 4, 2008 because, at
that time, no witnesses had come forward, a neighborhood canvas
had not provided any information, and surveillance cameras in the
area did not provide any evidence.[43]

On June 21, 2008, Sergeant James Audette completed an
IIR which states that he, and other officers, were advised that a
fight was ongoing in front of JB's Web.  The IIR states that when
Sergeant Audette arrived on the scene, a group of girls were

---

[40]     Defendants' Exhibit G, Coatesville Police Department Incident
Investigation Report No. 20080514M5364(01) completed by Detective Kevin
Campbell on May 14, 2008 at pages 1 and 4-9.

[41]     Id.

[42]     Defendants' Exhibit G, Coatesville Police Department Incident
Investigation Report No. 20080514M5370(01) completed by defendant Claude
Simpkins on May 14, 2008 at pages 1-2.

[43]     IIR No. 20080514M5364(01) at page 9.

dispersing from the area and that he did not observe any further problem.[44]

On July 10, 2008, Sergeant James Pinto completed an IIR which states that he observed a man exit JB's Web and stagger eastbound on Lincoln Highway until he fell to the ground. The IIR completed by Sergeant Pinto furhter states that the man was "obviously intoxicated beyond normal limits" and that he was "transported by ambulance to Brandywine Hosipital where he was treated for Alcohol Overdose."[45] The IIR does not suggest that any citation was issued to JB's Web in connection with this incident.[46]

On August 31, 2008 Officer James Pinto completed an IIR which states that he approached Ronnie Suber and asked that Mr. Suber assist him in "removing a drunk crowd" from JB's Web. The IIR does not indicate that JB's Web was cited as a result of this incident.[47]

On September 15, 2008 defendant Officer Ingemie completed an IIR which states that he observed a man walk out of

---

[44]     Defendant's Exhibit H, Coatesville Police Department Incident Investigation Report No. 20080623M7213(01) completed by Corporal James Audette on June 21, 2008 at page 1.

[45]     Defendants' Exhibit I, Coatesville Police Department Incident Investigation Report No. 20080710M8035(01) completed by Sergeant James Pinto on July 10, 2008 at page 1.

[46]     See id.

[47]     Defendants' Exhibit K, Coatesville Police Department Incident Investigation Report No. 20080831M0306(01) completed by Sergeant James Pinto on August 31, 2008 at pages 1-2.

- 21 -

JB's Web carrying an open container of Colt 45 beer.  Officer

Ingemie stopped the man and told him that he would receive an

open-container citation by mail.[48]  When Officer Ingemie stopped

the man with the open beer container, Ronnie Suber approached

Officer Ingemie and told Officer Ingemie that he had instructed

the man not to leave JB's Web with the open container of beer.

Nonetheless, Officer Ingemie issued a citation against JB's Web

for allowing an open container to be taken out of the bar.[49]

        Concerning the September 15, 2008 incident, the IIR was

supplemented by Officer Ingemie and states that the man pled

guilty to the open-container citation on October 14, 2008, and

JB's Web was found not guilty of the open-container citation.

The IIR further states that Officer Ingemie testified on August

31, 2009 about this incident at a LCB hearing concerning JB's

Web.[50]

        On November 10, 2008 Officer Keuch completed an IIR

which states that he was dispatched to JB's Web with to respond

to a report that an intoxicated man fell and hit his head on the

floor.  The IIR states that, when he arrived, Officer Keuch made

---

        [48]    Defendants' Exhibit J, Coatesville Police Department Incident
Investigation Report No. 20080915M1111(01) completed by defendant Jeffrey
Ingemie on September 15, 2008 at page 2.

        [49]    Defendants' Exhibit J, Coatesville Police Department Incident
Investigation Report No. 20080915M1112(01) completed by defendant Jeffrey
Ingemie on September 15, 2008 at pages 1 and 3.

        [50]    IIR No. 20080915M1111(01) at page 2; IIR No. 20080915M1112(01) at
page 3.

contact with Andrew Shelton who was "very intoxicated but did not appear to be injured".  The IIR states that Mr. Shelton had an open traffic warrant and Officer Keuch placed him under arrest. The IIR further states that Officer Keuch searched Mr. Shelton incident to his arrest and discovered, among other things, small plastic baggies containing a substance that field-tested positive for cocaine.  Again, the IIR does not suggest that JB's Web was cited in connection with this incident.[51]

### September 17, 2009 Pennsylvania Liquor Control Board Hearing

The Mhloyis own D Kendo, Inc. ("Kendo"), which owns and/or operates JB's Web.[52]  Kendo is the licensee holding the liquor license for JB's Web.[53]

The LCB sent a letter to Kendo dated March 18, 2009 identifying the LCB's concerns regarding the operation of JB's Web and informing that a hearing would be held to determine

---

[51]     Defendants' Exhibit L, Coatesville Police Department Incident Investigation Report No. 20081110M3993(01) completed by defendant Robert Keuch on November 10, 2008 at page 2.

[52]     See Bogai Deposition at pages 63-64; Plaintiffs' Exhibit H, Letter dated March 18, 2009 from Jane Melchior, Director, Bureau of Licensing, Pennsylvania Liquor Control Board, addressed to "Licensee" at "D Kendo, Inc., 302 W Lincoln Hwy, Coatesville PA 19320-3021" (Document 40-7)("March 18, 2009 LCB Letter"); and Plaintiffs' Exhibit I, Letter dated October 1, 2007 from Edward A. Taraskus, Esquire, counsel for D. Kendo, Inc., to Samuel Cohen, Esquire, hearing officer for the Pennsylvania Liquor Control Board (Document 40-8)("Taraskus Letter").

[53]     See March 18, 2009 LCB Letter at page 1; Taraskus Letter at page 1.

whether non-renewal of Kendo's liquor license was warranted.[54]

Specifically, the LCB Letter stated:

> [i]t is alleged that you have abused your license
> privilege and, pursuant to Section 470 of the
> Liquor Code (47 P.S. § 4-470), you may no longer
> be eligible to hold a license based upon:
>
> a)   violation of the Liquor Code relative to
>      Citation Number 06-1966.
>
> b)   The improper conduct of your licensed
>      establishment as there have been
>      approximately twelve (12) incidents of
>      disturbance at or immediately adjacent to
>      your licensed establishment during the time
>      period September 2007 to the present reported
>      to the Coatesville Police Department.  This
>      activity includes, but is not limited to
>      fights, a shooting, a stabbing, loud music,
>      crowds and disorderly operations.[55]

---

[54]   March 18, 2009 LCB Letter at page 1.

It is not clear from the record whether or not the liquor license
held by Kendo and used for the operation of JB's Web was ever suspended or
revoked.  Specifically, the March 18, 2009 LCB Letter states that, on
March 20, 2007, the LCB's Bureau of Licensing recommended non-renewal of the
license to take effect April 1, 2007.  However, the March 18, 2009 letter also
states that the objection and recommendation of non-renewal "resulted in the
approval of a Conditional Licensing Agreement (CLA)."  March 18, 2009 LCB
Letter at page 1.  Thus, it is not clear whether (a) there was a period of
time (between April 1, 2007 and the approval of the CLA) when Kendo did not
hold a valid liquor license, or (b) whether the CLA was approved prior to
April 1, 2007 and, thus, there was no period of time when Kendo was without
either a licence or conditional license under the CLA.

Attorney Dadamo, counsel for the Officer defendants and the City,
deposed plaintiff Bongai Mhlohi on November 7, 2011.  Randall J. Henzes,
Esquire, counsel for defendant Jon Guinta, attended that deposition and
questioned Ms. Mhloyi.  When questioned by Attorney Henzes, Bongai Mhloyi
testified that Kendo's liquor license was suspended at one point but that it
was reinstated on a temporary basis pending a hearing and that the license-
renewal process had (at that time) been "ongoing for a couple of years".
Bongai Deposition at page 107.  However, neither the questions from Mr.
Guinta's counsel, nor the answers from Bongai Mhloyi specify the period during
which the license was suspended, the date the temporary license became
effective, or the date of the referenced hearing.  See id.

[55]   March 18, 2009 LCB Letter at page 1.

- 24 -

The March 18, 2009 LCB Letter further states that,
based upon objections from the Bureau of Licensing of the LCB,
Kendo (and thus JB's Web) was operating pursuant to a Conditional
Licensing Agreement for the licensing period beginning April 1,
2007 and that, because the LCB approved that Conditional
Licensing Agreement, "there have been approximately three (3)
incidents of loudspeaker violations *submitted by the Coatesville
Police Department*."[56]

The March 18, 2009 LCB Letter makes no reference to any
of the individual Officer defendants, nor does it support a
reasonable inference that the Officer defendants sent copies of
Incident Investigation Reports concerning JB's Web to the LCB.
However, drawing all reasonable inferences in favor of
plaintiffs, the non-movants, as required by the forgoing standard
of review, the March 18, 2009 LCB Letter supports a reasonable
inference that the Coatesville Police Department forwarded copies
of IIRs purportedly related to JB's Web to the LCB.

Subsequently, the LCB sent Kendo an Amended Objection
Letter and Notice of Hearing dated August 17, 2009 ("August 17,
2009 LCB Letter").  The August 17, 2009 LCB Letter scheduled a
hearing concerning the operation of JB's Web and Kendo's license
to commence August 31, 2009 in Plymouth Meeting, Montgomery

---

[56]     March 18, 2009 LCB Letter at page 1 (emphasis added).

County, Pennsylvania.  The alleged abuses concerning the operation of JB's Web were modified slightly in the August 17, 2009 LCB Letter.[57]  Specifically, the allegations in para-graph (b) were amended to add two incidents, and read as follows:

> b)    The improper conduct of your licensed estab-lishment as there have been approximately fourteen (14) incidents of disturbance at or immediately adjacent to your licensed estab-lishment during the time period September 2007 to the present reported to the Coates-ville Police Department.  This activity includes, but is not limited to fights, a shooting, a stabbing, loud music, crowds and disorderly operations.[58]

The LCB hearing was held on September 19, 2007, and on October 1, 2007, Edward A. Taraskus, Esquire, counsel representing Kendo at the LCB hearing, wrote a supplemental letter to the LCB for the purpose of highlighting corrective measures taken by Kendo with respect to the alleged abuses and incidents which where the subject of the LCB's March 18 and August 17, 2009 letters and the September 19, 2007 hearing.[59]

---

[57]    Compare March 18, 2009 LCB Letter at page 1, with August 17, 2009 LCB Letter at page 1.

[58]    August 17, 2009 LCB Letter at page 1.

[59]    See Taraskus Letter at pages 1-4.

Although it is not entirely clear from record, it appears that Kendo's license has not been revoked or suspended and that JB's Web remains in operation at this time.[60]

## March 13, 2010 BLCE Inspection

On March 13, 2010, six to ten officers from the Coatesville police department -- including Officers Keuch[61] and Simkins -- participated in an inspection of five or six bars in Coatesville during a short period of time. The Pennsylvania State Police Bureau of Liquor Enforcement ("BLCE") led this multi-establishment inspection.[62] Plaintiffs refer to the March 13, 2010 inspection as a "raid", while the moving defendants refer to the March 13, 2010 inspection as a "law enforcement event".[63]

---

[60]     The record evidence and motion papers submitted by the parties do not expressly identify a date on which Kendo's liquor license was suspended or revoked, or on which JB's Web ceased operations.

    Moreover, Plaintiffs' Brief asserts that "[t]he custom and practice in Coatesville was to single the plaintiffs out and target them for a litany of citations all of which were thrown out by local courts because they saw through what was happening. Upon information and belief[,] white citizens and bars who clearly enjoyed the approbation of Coatesville officials engaged in an effort to run JB's Web out of the city. That effort was unsuccessful." Plaintiffs' Brief at page 10. I interpret this assertion by plaintiffs as confirmation that JB's Web remains in operation and that Kendo's license was not revoked or suspended by the LCB.

[61]     Keuch Deposition at page 18.

[62]     Simkins Deposition at page 8; Wright Deposition at page 7. Defendant Officer Wright did not participate in the March 13, 2010 inspection. Wright Deposition at page 7. Neither party has indicated, and the record is bare concerning whether or not defendant Officer Miller participated in the March 13, 2010 inspection.

[63]     See Simkins Deposition at page 6; Bongai Deposition at page 17.

In addition to JB's Web, and several other public bars, the March 13, 2010 inspection included the VFW in Coatesville -- a private club whose membership is predominantly African-American. The Polish Club -- a private club in Coatesville whose membership is primarily Caucasian -- was not included in the March 13, 2010 multi-location inspection.[64] There is no record evidence indicating that the Coatesville police department played a role in identifying the establishments to be inspected on March 13, 2010.

<u>Summary of Incidents</u>

In support of their motion, the moving defendants in Exhibit M provided a "summary of incidents at the bar between 2007 and 2010" which, they contend, shows that there were "a total of at least 170 incidents to which police officers responded from January 1, 2007 through August 11, 2010."[65]

---

[64]    Simpkins Deposition at page 8.

[65]    <u>See generally</u> Defendants' Exhibit M, Index and Summary of Incidents at JB's Web Bar summarizing incidents from January 9, 2007 through August 11, 2010. Defendants offer Exhibit M pursuant to Fed.R.Evid. 1006, which provides that

> [t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Defendants' Statement of Facts at ¶ 18, n.1.

Defendants further state that the records referenced in, and which provide the basis for, the incident summaries included in Exhibit M were produced to plaintiffs as part of the initial, mandatory discovery disclosures required by Fed.R.Civ.P. 26(a)(1). Defendants' Statement of Facts at ¶ 18,

In response to the moving defendants' factual assertion that police responded to at least 170 incidents "at the bar" between January 2007, and August 2010, plaintiffs deny that such a number of incidents occurred at, or involved, JB's Web.[66] Specifically, plaintiffs contend that Defendants' Exhibit M "contains redundant reports" and that it counts single incidents as separate incidents in an "attempt[] to 'pad the record'".[67] Additionally, plaintiffs contend that Exhibit M includes incident summaries that are not related to JB's Web.[68]

In sum, plaintiffs assert that Defendants' Exhibit M demonstrates defendants' "continued harassment by these defendants to indicate that [JB's Web] was a nuisance bar."[69]

Each incident summary in Defendants Exhibit M is a single paragraph organized and identified by date, not by Incident Investigation Report number. There are multiple instances where the same date is identified with multiple paragraphs (allegedly separate incidents) -- July 26, 2007; September 27, 2007; August 31, 2008; September 4, 2008;

---

n.1.

[66]    Plaintiffs' Counterstatement of Fact at ¶ 17.

[67]    Id.

[68]    Id.

[69]    Id.

September 15, 2008; October 17, 2008; November 10, 2008;
December 25, 2009; March 8, 2010; and March 13, 2010.

However, plaintiffs do not specify which paragraphs in
Exhibit M are allegedly duplicative summaries that cover the same
incident.  Moreover, while multiple incidents are attributed to
ten separate dates in Defendants' Exhibit M (listed above), only
March 13, 2010 (the date of the BLCE inspection) attributes
multiple incidents (specifically, the arrests of three separate
individuals by two separate Coatesville police officers) to a
single date and event (the March 13, 2010 BLCE inspection).[70]

As evidence of the moving defendants efforts to "'pad
the record' with unrelated incidents", plaintiffs cite the two
incidents which are attributed to JB's Web for June 27, 2007.[71]
Those incidents are described by the moving defendants as
follows:

> 06/27/07   Officer Vargo was stationary outside JB's Web
> and observed Kahlil White, a 12-year old male
> walking westbound.  Officer Vargo took White
> into custody and transported him to 216 Char-
> les Street and made contact with his mother,
> Megan White.  A curfew slip was given to
> White and instructed of the new curfew times.
> Case disposition – closed with no further
> action.
>
> 06/27/07   Officer Vargo was stationary outside JB's Web
> and observed Japri Green, a 9-year old male
> walking westbound.  Officer Vargo took Green
> into custody and transported him to 216 Char-

---

[70]   Defendants' Exhibit M at pages 27-28.

[71]   Plaintiffs' Counterstatement of Facts at ¶ 17.

les Street and made contact with his mother,
Tanisha Green.  A curfew slip was given to
Green and instructed of the new curfew times.
Case disposition – closed with no further
action.[72]

It is not apparent from these summaries (1) how, if at
all, the curfew violations allegedly committed by these two boys
implicate or concern JB's Web, and (2) whether these were two
incidents where one boy was picked up, or one incident where two
boys were picked up.[73]

## CONTENTS

### Moving Defendants' Contentions

The Officer defendants contend that they are entitled
to summary judgment in their favor because the Mhloyi plaintiffs
failed to provide record evidence which would allow a reasonable
juror to conclude that any of the individual moving defendants
(a) took any action toward the Mhloyi plaintiffs, or JB's Web,
because of the Mhloyis' race, or (b) treated the Mhloyi plain-
tiffs differently than similarly situated bar owners who are not
African American.[74]  In short, the Officer defendants contend
that there is no record evidence that they themselves ever

---

[72]    Defendants' Exhibit M at pages 5-6.

[73]    See Defendants' Exhibit M at pages 5-6.

[74]    Defense Brief at pages 4 and 10.

targeted JB's Web, or treated the bar or its owners differently, because of the Mhloyis' race or that of their bar's patrons. [75]

The City contends that it is entitled to summary judgment in its favor based upon two alternative grounds.  First, the City contends that the Mhloyis cannot prove any equal protection violations by the Officer defendants and, therefore, cannot sustain an equal protection Monell[76] claim against the City.[77]

Second, and alternatively, the City contends that the Mhloyis have not provided record evidence which would permit a reasonable juror to find that the City has a policy, custom or practice of treating the Mhloyis, or JB's Web, differently from any other bar owner, or public bar, in the City.[78]

## Mhloyi Plaintiffs' Contentions

Before responding to the substance of the moving defendants' arguments, plaintiffs request that I strike the Defendants' Brief in its entirety.[79]  Specifically, plaintiffs assert that I should decline to consider, and strike, the Defendants' Brief because the section containing the moving defendants' legal argument does not included citations to specific

---

[75]     Defense Brief at pages 4 and 10.

[76]     Monell v. City of New York Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

[77]     Defense Brief at pages 8-9.

[78]     Id. at page 9.

[79]     Plaintiffs' Brief at page 9.

record evidence.[80]  However, plaintiffs decline to note that
Defendants' Brief includes a "Factual Background" section which
incorporates, by reference, Defendants' Concise Statement of
Undisputed Facts.[81]  I deny plaintiffs' request to strike and
have considered the Defendants' Brief.

To the extent that plaintiffs' own brief actually
respond to the arguments made by the moving defendants, plain-
tiffs contend that the record evidence is sufficient to support a
"selective enforcement" equal protection claim by the Mhloyis
against both the individual Officer defendants and, under <u>Monell</u>,
the City.[82]

## DISCUSSION

### Section 1983 Claims

Plaintiffs' constitutional claims in Count II are
actionable against defendants through 42 U.S.C. § 1983.  Section
1983 is an enabling statute that does not create any substantive
rights, but provides a remedy for the violation of federal
constitutional or statutory rights.  <u>Gruenke v. Seip</u>,
225 F.3d 290, 298 (3d Cir. 2000).

---

[80]    <u>Id.</u>

[81]    <u>See</u> Plaintiffs' Brief at page 9; Defense Brief at page 1
(incorporating Defendants' Concise Statement of Undisputed Facts).

[82]    Plaintiffs' Brief at pages 10-11.

Section 1983 states:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen
> of the United States or other person within the
> jurisdiction thereof to the deprivation of any
> rights, privileges or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity,
> or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, to state a claim under section 1983, a plaintiff
must allege that defendant, acting under color of state law,
deprived plaintiff of a federal constitutional or statutory
right.  Chainey v. Street, 523 F.3d 200, 219 (3d Cir.
2008)(quoting Kaucher v. County of Bucks, 455 F.3d 418, 423
(3d Cir. 2006)).

Although the Motion for Summary Judgment challenges the
sufficiency of plaintiffs' proof supporting the constitutional
violations allegedly committed by the moving defendants, the
moving defendants do not seek summary judgment on the ground that
they were not acting under color of state law when they took the
actions which are the subject of the Mhloyi plaintiffs' equal
protection claims.

## Equal Protection

The Fourteenth Amendment of the United States
Constitution provides that "[n]o State shall...deny to any person
within its jurisdiction the equal protection of the laws." U.S.

Const. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike." Shuman v. Penn Manor School District, 422 F.3d 141, 151 (3d Cir. 2005) (citation omitted).

The United States Court of Appeals for the Third Circuit has explained that "[t]o bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." Andrews v. Philalphia, 895 F.2d 1469, 1478 (3d Cir. 1990)(citation omitted). "They must demonstrate that they received different treatment from that received by other individuals similarly situated." Id. (internal quotation marks and citation omitted).

Selective enforcement of, and selective prosecution under, facially neutral laws or policies is a form of discrimi-nation that has been held to violate the Equal Protection Clause of the United States Constitution. Davis v. Malitzki, 451 Fed.Appx. 228, 234 (3d Cir. 2011)(citing Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).

### Selective Enforcement

The Mhloyi plaintiffs contend that they have provided sufficient record evidence to establish their selective enforce-ment equal protection claims against the Officer defendants and the City.[83]

---

[83]    Plaintiffs' Brief at pages 10-11.

To establish an equal protection claim based upon
selective enforcement, a plaintiff must demonstrate (1) that he
was treated differently from other similarly situated indivi-
duals, and (2) "that this selective treatment was based on an
unjustifiable standard, such as race, or religion, or some other
arbitrary factor...or to prevent the exercise of a fundamental
right." Dique v. New Jersey State Police, 603 F.3d 181, 184 n.5
(3d Cir. 2010)(citing Hill v. City of Scranton, 411 F.3d 118, 125
(3d Cir. 2005))(internal quotation marks omitted).

Selective enforcement of, and selective prosecution
under, facially neutral laws "may constitute illegal discrimi-
nation even if the [enforcement or] prosecution is otherwise
warranted" where the differential treatment is based upon an
improper, discriminatory motive. Desi's Pizza, Inc. v. City of
Wilkes-Barre, 321 F.3d 411, 425 (3d Cir. 2003)("Desi's Pizza I").

Persons are similarly situated under the Equal Protec-
tion Clause when they are "alike in all relevant aspects."
Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir.
2008). In other words, "[t]he Plaintiffs must prove that [JB's
Web] was treated differently than similarly situated establish-
ments that did not have predominantly minority clientele, and the
Plaintiffs must produce evidence from which a racially discrimi-
natory purpose can be inferred." Desi's Pizza, Inc. v. City of

<u>Wilkes-Barre</u>, 2006 U.S.Dist. LEXIS 59610, *69 (M.D.Pa. August 23, 2006)(Blewitt, M.J.)("<u>Desi's Pizza</u>").

Intentional or purposeful discrimination is a necessary element of an equal protection claim.  <u>Wilson v. Schillinger</u>, 761 F.2d 921, 929 (3d Cir. 1985).  For a section 1983 plaintiff to survive a motion for summary judgment where intent is an element of his claim, the plaintiff must provide affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive. <u>Desi's Pizza II</u>, 2006 U.S.Dist. LEXIS 59610 at *68-69 (quoting <u>Johnson v. Anhorn</u>, 416 F.Supp.2d 338, 376 (E.D.Pa. 2006)(Brody, J.)).

In the <u>Desi's Pizza</u> case, the plaintiffs were owners of a restaurant and bar called Desi's Pizza which was located in Wilkes Barre, Pennsylvania.  <u>Desi's Pizza II</u>, 2006 U.S.Dist. LEXIS 59610 at *2-3.  The owners of Desi's Pizza claimed that the defendants -- including the mayor and police chief of Wilkes Barre -- violated the plaintiffs' equal protection rights "by singling out the Plaintiffs' establishment and treating it more harshly than other establishments similarly situated".  <u>Id.</u> at *2-4 and 67.

In permitting the plaintiffs' equal protection selective prosecution claim to proceed in <u>Desi's Pizza</u>, the Third Circuit Appeals Court noted that a state court's determination

that Desi's Pizza was a common nuisance under Pennsylvania law did not necessarily undermine the plaintiffs' equal protection claim. Desi's Pizza I, 321 F.3d at 425-426. The Third Circuit stated that "the plaintiffs' Equal Protection...claims may proceed on the theory that, although there were numerous establishments in Wilkes-Barre that clearly constituted common nuisances under Pennsylvania law, the defendants targeted Desi's with the intent to drive certain ethnic groups out of the city." Id. at 425.

In other words, "[t]he theory of plaintiffs' Equal Protection...claims...[was] that other establishments possessing liquor licenses in Wilkes-Barre had committed equally serious and obvious violations of the Liquor Code and/or the Crimes Code, and that the defendants overlooked those violations because of the ethnic composition of those establishments' clientele." Id. The appeals court further noted that "it may be the case that may establishments in Wilkes-Barre constituted 'common nuisances' under Pennsylvania law...but the defendants chose to focus solely on Desi's." Id. at 426 n.4.

At the summary judgment stage in Desi's Pizza, the defendants sought summary judgment on the plaintiffs' equal protection selective prosecution claim "by arguing that the Plaintiffs [had] no evidence that [the Defendants] treated the Plaintiffs more harshly than other similarly situated bars

because of the 'makeup' of [Desi's] customers." Desi's Pizza II,
2006 U.S.Dist. LEXIS 59610 at *67. The plaintiffs responded by
arguing that they had produced record evidence that "other bars
similarly situated, but with predominantly Caucasian customers
were not targeted for closure like Desi's Pizza, despite having
similar violations." Id. at *67.

       In support of their selective prosecution equal
protection claims, the plaintiffs in Desi's Pizza provided
deposition testimony identifying six bars that (1) were in the
same neighborhood as Desi's Pizza; (2) had committed ordinance
violations similar to Desi's; and (3) served a predominantly
Caucasian clientele. See id. at *77. Moreover, the plaintiffs
offered deposition testimony that while the defendants did not
prosecute these six bars as common nuisances under Pennsylvania
law, the defendants prosecuted and shut down Desi's Pizza and
four other bars located near Desi's which each served a
predominantly minority clientele. Id. at *78.

       Importantly, the district court noted that "the
Plaintiffs have offered significant admissible evidence regarding
the number of complaints against the other bars and how they were
comparable to Desi's Pizza, and that these other bars engaged in
conduct comparable to Desi's Pizza such that the defendants
should have taken enforcement action against the other bars."
Id. at *79-80. This led the district court to conclude that

there was "enough evidence produced so that a jury must determine if Desi's Pizza was singled out for selective enforcement as compared to the other identified bars, and if the Defendants' motivation [for that enforcement] was the impermissible consideration of the predominantly African-American and Latino clientele of Desi's Pizza."  Desi's Pizza II, 2006 U.S.Dist. LEXIS 59610 at *80.

Here, unlike the plaintiffs in Desi's Pizza, the Mhloyis have identified one establishment -- the Polish Club -- which they contend is similarly situated for purposes of their equal protection claims.  More importantly, the Mhloyis have not offered significant admissible evidence concerning complaints against, or incidents which took place at (or involved), the Polish Club but were ignored by the Officer defendants or other members of the Coatesville police department.

Although the record evidence demonstrates some involve-ment by each of the Officer defendants with JB's Web, the record evidence, with all reasonable inferences drawn in favor of the plaintiffs, is insufficient to sustain the Mhloyi plaintiffs' selective enforcement equal protection claims against the Officer defendants.

The Mhloyi plaintiffs have produced record evidence demonstrating that each of the Officer defendants have authored Incident Investigation Reports concerning incidents inside, or

near, JB's Web.  Officer Claude Simpkins never wrote any noise-

ordinance citations against JB's Web.[84]  The Mhloyi have not

produced any record evidence demonstrating that Officers Keuch or

Officer Miller issued any citations of any kind against JB's Web.

On September 15, 2008, Officer Ingemie issued an open-container

citation against JB's Web.  When the bar challenged the open-

container citation in court, it was found not guilty.[85]

However, the fact that each Officer defendant has taken

some type of action concerning JB's Web is not sufficient to

sustain the Mhloyi plaintiffs' selective enforcement equal

protection claims against each Officer defendant.  Rather, to

sustain those claims, the Mhloyis were required to provide

affirmative evidence from which a jury could find that they

carried their burden of proving both differential treatment of

themselves and of JB's Web by the Officer defendants, and the

pertinent motive -- purposeful, intentionally discriminatory

treatment based upon race.  See Wilson, 761 F.2d at 929; Desi's

Pizza II, 2006 U.S.Dist. LEXIS 59610 at *68-69.

The Mhloyis have not provided record evidence showing,

or supporting a reasonable inference that any of the Officer

defendants treated JB's Web differently than the Polish Club or

---

[84]    Simpkins Deposition at page 10; Defendants' Statement of Facts at
¶ 29; Plaintiffs' Counterstatement of Facts at ¶ 29.

[85]    IIR No. 20080915M1111(01) at page 2; IIR No. 20080915M1112(01) at
page 3.

any other arguably-similarly-situated establishment whose clientele is not predominantly African-American. The record evidence does not demonstrate or suggest that the Officer defendants (1) responded to incidents at, or complaints about, the Polish Club, but did not complete Incident Investigation Reports about those events; (2) sent IIRs referencing JB's Web to the state LCB, but did not send IIRs referencing the Polish Club; or (3) responded after hearing, or receiving a complaint about, noise from JB's Web, but did not respond after hearing, or receiving a complaint about, noise from the Polish Club.

Ronnie Suber's deposition testimony, in which he generally stated that the Polish Club made more noise than JB's Web and that he never saw a police officer respond to noise at the Polish club, does not establish, or support a reasonable inference, that any of the Officer defendants heard noise from (or received a noise complaint about) the Polish Club and ignored it while responding to similar noise levels from (or noise complaints about) JB's Web.

Moreover, the Mhloyis have not provided record evidence which would allow a reasonable juror to conclude that any of the Officer defendants intentionally mistreated the Mhloyis or JB's Web because the Mhloyis, and their patrons, are African-American.

In order to establish their claims against the Officer defendants, the Mhloyis were required to provide affirmative

evidence from which the jury could find that the Mhloyis carried their burden of proving the pertinent motive.  <u>Desi's Pizza II</u>, 2006 U.S.Dist. LEXIS 59610 at *68-69.

The Mhloyis assert that "Officer Simpkins testified that there is a race problem in the City of Coatesville."[86] Although it is not cited by the Mhloyis, Officer Wright also testified about a "race problem" in the City of Coatesville.[87]

---

[86]    Plaintiffs' Counterstatement of Facts at page 4, ¶ 4 (citing Simpkins Deposition at page 13, lines 4-8).  The quoted portion of the Simpkins Deposition, conducted by plaintiffs' counsel, Don Bailey, Esquire, reads as follows:

> Q [Attorney Bailey]:    From the standpoint of a black citizen, not so much as a police officer who's got a job to do, is there a race relations problem in Coatesville?
>
> A [Officer Simpkins]:    Yes.

Simpkins Deposition at page 13.

Then, in a portion of the transcript not cited by the Mhloyis, Attorney Bailey follows up with Officer Simpkins concerning law enforcement in the City of Coatesville:

> Q [Attorney Bailey]:    Do you believe that there is a tendency to enforce the law too much against black people as opposed to white people in Coatesville?  And if you don't have an opinion on it, I'm not here to trip you up or harm you, understand?  If you have an opinion on it based on your observations on what you've seen as a law enforcement officer; if you could answer that.
>
> A [Officer Simpkins]:    Based on what I've observed myself, no.

Simpkins Deposition at page 13-14.

[87]    Specifically, Attorney Bailey questioned Office Wright about the existence of a racial problem in the City:

> Q [Attorney Bailey]:    I've got clients who are complaining that [they are] mistreated because of the color of their skin.  I'm an ideological nut, so

(Footnote 87 continued):

The deposition testimony about a "race problem" in the City of Coatesville supports a reasonable inference that African-American residents and visitors of the City view the Coatesville police department and its officers with distrust, but it does not demonstrate, or support a reasonable inference that any of the Officer defendants acted with racial animus toward the Mhloyis or the patrons of JB's Web.

Because the Mhloyis failed to provide sufficient record evidence of the Officer defendants' purpose or intent to treat the Mhloyis and JB's Web differently than the Polish Club, the

---

(Continuation of footnote 87):

> I pursue those things, okay? I think I'm, you know, Don Quixote so I'm going to go out there and fight these things. Change America overnight. And believe me, I got a lot of enemies that don't want to see me change anything. Believe me. I do. But, the point is, the important point is, is there a race problem in this city?

A [Officer Wright]:        In the city itself?

Q [Attorney Bailey]:        Yes.

A [Officer Wright]:        Yes.

Wright Deposition at page 14.

    Officer Wright, who is African American, went on to testify that he was "treated much differently by the public than a white officer" and as a result, has a "harder time doing [his] job th[a]n a white officer[] would." Id. at page 15. Officer Wright further testified that, based upon his experience, the African-American's in Coatesville are more distrustful of law enforcement officers than Caucasians in Coatesville. Id. at page 16.

    However, Officer Wright did not offer any testimony suggesting that there was a "race problem" within the City administration generally or the Coatesville police department specifically. See id. at pages 12-16. Indeed, when Attorney Bailey asked Officer Wright whether he had "ever been mistreated by the city administration in Coatesville because of [his] race", Officer Wright responded, "No, I wouldn't say because of my race, no." Id. at pages 12-13.

Mhloyis have failed to establish a necessary element of their equal protection claims against each Officer defendant, namely intentional or purposeful discrimination.  See Schillinger, 761 F.2d at 929.

Accordingly, the Mhloyi plaintiffs have not met their burden to sustain their selective enforcement equal protection claims against the Officer defendants.  Therefore, I grant the Motion for Summary Judgment and enter judgment in favor of defendant Officers Keuch, Ingemie, Miller, and Simpkins, and against plaintiffs Bongai Mhloyi and Jeremiah Mhloyi.

## Municipal Liability

The United States Court of Appeals for the Third Circuit has held that "a municipality can be liable under section 1983 and the Fourteenth Amendment...even if no individual officer...violated the Constitution."  Fagan v. The City of Vineland, 22 F.3d 1283, 1294 (3d Cir. 1994).  In Fagan, independent municipal liability was found to exist because the plaintiff brought separate, independent claims against the municipality and its officers, and each were based on different theories and required different proof.  Id. at 1292.

Here, the Mhloyi plaintiffs have asserted equal protection claims against both the Officer defendants and the City.  Although the Mhloyis' claim against the City arises, in part, from the conduct of the Officer defendants, the Mhloyis

also allege that the City caused their injuries through an official custom of harassment which extended beyond the conduct of the named Officer defendants.  Accordingly, I conclude that the absence of liability concerning the Officer defendants, discussed above, does not automatically preclude a finding of liability on the part of the City.

In order for liability to attach to a public entity, such as defendant The City of Coatesville, a plaintiff must establish that the constitutional violation resulted from the execution of an official policy or custom promulgated by municipal lawmakers or policymaking officials.  Maisonet v. City of Philadelphia, 2007 U.S.Dist. LEXIS 33401 at *7 (E.D.Pa. May 7, 2007)(McLaughlin, J.)(citing Monell, 436 U.S. at 694-95).

### Policy

An official policy exists for purposes of Monell liability "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  Watson v. Abington Township, 478 F.3d 144, 155 (3d Cir. 2007)(quoting Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990))(internal quotations omitted and alteration in original).

Here, the Mhloyis have not identified, or provided record evidence establishing the existence of, an official proclamation, policy, or edict promulgated by a policymaker for

the City stating that (a) Coatesville police officers should issue meritless noise citations against JB's Web, or (b) Coatesville police officers should attribute unrelated incidents to JB's Web and/or send Incident Investigation Reports concerning JB's Web to the Liquor Control Board (while holding back -- or not writing -- IIRs concerning the Polish Club or other bars in the City that do not have a predominantly African-American clientele).  Accordingly, I conclude that the Mhloyi's have not produced sufficient evidence to establish their equal protection <u>Monell</u> policy claim against the City.

Custom

In the absence of an official policy, a municipality may nonetheless incur liability where an official custom causes a constitutional tort.  <u>See</u> <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996).  "A Custom...can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well settled and permanent as virtually to constitute law."  <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 850 (3d Cir. 1990).  Typically, establishment of a municipal custom requires proof of a pattern of underlying constitutional violations.  <u>Carswell v. Homestead</u>, 381 F.3d 235 (3d Cir. 2004).

The Third Circuit Appeals Court has explained, "it is clear under either route [(policy or custom)] that a plaintiff

must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiessence in a well-settled custom." Watson, 478 F.3d at 156 (quoting Bielevicz, 915 F.2d at 850)(internal quotations omitted).

In other words, where, as here, a plaintiff does not produce evidence of an official policy, the plaintiff must, in order to establish municipal liability based upon custom or practice, provide record evidence that a municipal policy- or decision-maker had knowledge of, and acquiesced in, a well-settled custom or practice of the municipality's employees or agents. See id.

In Watson, the Third Circuit Appeals Court, among other things, affirmed the district court's decision granting summary judgment in favor of the municipal defendants (including Abington Township, Abington Township Police Department, and Police Chief William J. Kelly, in his official capacity) "based on a lack of evidence from which a jury could infer a municipal policy or custom of discriminating against African-Americans." 478 F.3d at 147.

In Watson, a plaintiff named Gerald W. Kelly owned and operated a business, Just Jerry's, Inc. (trading and doing business as Scoreboard Restaurant and Tavern). 478 F.3d at 147-148. Gerald Kelly leased the storefront next to the Scoreboard

Restaurant and Tavern to co-plaintiff Antonio D. Watson.  Antonio
Watson operated his own ticket business, Tony Tix, Inc., out of
the storefront leased from Gerald Kelly from October 1998, to
February 2000.  Watson, 478 F.3d at 148.  Gerald Kelly was a
retired 28-year veteran of the Abington Police Department.
Antonio Watson was African-American.  Id. at 147-148.

Shortly after Antonio Watson opened Tony's Tix in the
storefront leased from Gerald Kelly, two lieutenants from the
Abington Township Police Department spoke to Mr. Kelly about
Mr. Watson.  During the conversation, Mr. Kelly mentioned to the
lieutenants that he might sell the Scoreboard Restaurant and
Tavern to Mr. Watson. Upon hearing this, one of the lieutenants
stated to Mr. Kelly that he had heard Mr. Kelly was considering
selling the tavern to Mr. Watson and that, if he did, the police
would "raid [the Scoreboard] out of business" and Mr. Kelly could
"buy it back cheap."  Watson, 478 F.3d at 148.

Although Mr. Kelly ultimately decided not to sell the
Scoreboard to Mr. Watson, Mr. Kelly and the other plaintiffs
argued that "the police did precisely what [the lieutenant]
suggested they would do: raid [the Scoreboard] out of business
based on [Kelly's] association with Watson."  Watson, 478 F.3d
at 148.  Specifically, the record evidence produced at the
summary judgment stage indicated that the Abington police:
(1) conducted four sweeps of the Scoreboard between May 1999, and

November 2000; (2) stationed a marked patrol car outside the Scoreboard beginning in 1998; and (3) erected a DUI checkpoint directly in front of the Scoreboard with floodlights illuminating the interior of the bar on one occasion during 1998 or 1999.  Id.

Moreover, the plaintiffs in Watson provided the sworn affidavit of an African-American patron of the Scoreboard who recounted being stopped by Abington Township police officers for no legitimate reason on multiple occasions.  Id. at 148-149.  An employee stated in his sworn affidavit that the Scoreboard was raided two nights in a row in one week while "no other bars were being raided in this manner", and that during the raids, "African-American customers were harassed more than Caucasian customers."  Id. at 149.

Additionally, the plaintiffs in Watson presented the deposition testimony of Gerald Kelly in which Mr. Kelly discussed his experience during 28 years with the Abington Township Police Department.  Specifically, Mr. Kelly testified at his deposition that "it was 'common knowledge' that racial profiling in traffic stops was an easy way for an officer to increase the number of traffic tickets he issued" and that "racial profiling occurred on a weekly basis, and that it was still occurring when he retired in 1993."  Watson, 478 F.3d at 149.  Mr. Kelly testified that most members of the police department knew about the practice of racial profiling, and that Chief Kelly "should have known."  Id.

Notwithstanding the record evidence just described, the Third Circuit in Watson affirmed the district court's decision granting summary judgment in favor of the municipal entity defendants and against the plaintiffs on plaintiffs' equal protection Monell claim. The district court's decision granting summary judgment, which the Third Circuit upheld, was "predicated on [plaintiffs] failure to advance evidence from which a jury could conclude that a municipal policy or custom caused their injury." Watson, 478 F.3d at 155.

In discussing the record evidence with respect to the Watson plaintiffs' equal protection Monell claim, the Third Circuit began by noting that the evidence (particularly the deposition testimony of Mr. Kelly) was sufficient to support "an inference that racial profiling was a common practice in the [Abington Township Police] Department to increase the number of traffic tickets issued during the twenty-eight years [that the plaintiff, Mr.] Kelly[,] was there, including the time Chief Kelly was the chief of police." Id. at 156. Moreover, the Third Circuit noted that, "[a]ccording to [Mr.] Kelly's sworn testimony, Chief Kelly would have known about the profiling and racial slurs unless he was 'totally absent,' which he was not." Watson, 478 F.3d at 156.

However, the Third Circuit held that, even taking the record evidence in the light most favorable to the plaintiffs,

the plaintiffs' only evidence of a policy or custom of the municipal defendants ended in 1993, five years prior to August 1998,[88] the time period pertinent to the plaintiffs' claims concerning the defendants' treatment of the Scoreboard Restaurant and Tavern and its patrons.  Watson, 478 F.3d at 156.

The Third Circuit then turned to address the record evidence supplied by the plaintiff which was related to the pertinent time period.  When it did so, the Third Circuit concluded that that "[t]he only evidence [the plaintiffs] have after Gerald Kelly retired from the police force consists of affidavits regarding the behavior that is the subject of their complaint." Id.  Those affidavits stated that (a) police officers "disproportionately harassed and stopped African-American[] customers in 1998 and 1999"; (b) a Scoreboard employee witnessed an Abington Township police officer harassing an African-American customer; and (c) a customer was stopped on several occasions after leaving the Scoreboard.  Id.

In affirming the district court's grant of summary judgment in favor of the municipal defendants in Watson, the Third Circuit stated that even if the assertions of racial harassment in those affidavits were true, "they raise no inference of a policy or practice of discrimination by the [Abington Township Police] Department."  478 F.3d at 156.

_____

[88]    Gerald Kelly began leasing his storefront property to Antonio Watson on August 10, 1998.  Watson, 478 F.3d at 148.

The Third Circuit concluded that the plaintiffs' equal protection <u>Monell</u> claim against the municipal defendants failed because the plaintiffs failed to produce evidence relating to any decision-maker within the police department during the pertinent time period.  <u>Watson</u>, 478 F.3d at 157.

Moreover, the plaintiffs in <u>Watson</u> did not argue or produce record evidence that the alleged racial harassment by police officers at the Scoreboard Restaurant and Tavern "was so widespread that a decisionmaker must have known about it."  <u>Id.</u> Under those circumstances, the Third Circuit concluded that "[a] Plaintiff does not raise a reasonable inference of a well-settled custom" and the supporting affidavits offered by plaintiffs' in opposition to summary judgment were essentially "restating the behavior that is the subject of their complaint."  <u>Id.</u>

Here, as in <u>Watson</u>, the Mhloyis have not produced record evidence concerning the awareness of any decisionmaker in the City's police department or administration concerning the alleged practice of issuing noise-ordinance citations against JB's Web and not against the Polish Club.

The Mhloyis rely on Officer Simpkins' testimony and assert that it supports their equal protection <u>Monell</u> claim against the City.[89]  However, Officer Simpkins testimony about a generalized "race problem" in the City of Coatesville and

---

[89]    Plaintiffs' Brief at page 11 (citing Simpkins Deposition at page 13).

distrust of the police in Coatesville among African-Americans, as well as the similar testimony of Officer Wright,[90] is not tied to any alleged official policy or custom of the Coatesville police department or the City's administration.  Indeed, when asked if there was a "tendency to enforce the law too much against black people as opposed to white people in Coatesville", Officer Simpkins responded that there was not.[91]

The deposition testimony from Officers Simpkins and Wright does not support a reasonable inference that it was the practice of members of the Coatesville police department to treat the Mhloyis, or JB's Web, differently than other establishments in Coatesville with respect to noise citations or Incident Investigation Reports, or that such a practice was so common and well-settled that decision-makers within the City's administration or police department would have to have been aware of it.

As discussed in the Facts section above, the March 18, 2009 Liquor Control Board letter to Kendo concerning alleged abuses of Kendo's liquor license at JB's Web supports a reasonable inference that the Coatesville Police Department sent copies of IIRs involving, or relating to, JB's Web to the LCB.

However, that inference relates to the City's custom or practice concerning JB's Web only, and not to any custom or

---

[90]    See footnote 78, supra.

[91]    Simpkins Deposition at pages 13-14.

practice concerning the City's treatment of establishments which do not have a predominantly African-American clientele. The Mhloyis have not produced any record evidence with respect to practices or customs within the Coatesville Police Department concerning the creation, or handling, of Incident Investigation Reports involving, or related to, other licensed establishments in the City.

In other words, the Mhloyis have not provided sufficient record evidence establishing the existence of, a pervasive custom or practice within the Coatesville police department pursuant to which Coatesville police officers were to (a) issue meritless noise citations against JB's Web, or (b) attribute unrelated incidents to JB's Web and/or send Incident Investigation Reports concerning JB's Web to the Liquor Control Board (while holding back -- or not writing -- IIRs concerning the Polish Club or other bars in the City that do not have a predominantly African-American clientele). Accordingly, I conclude that the Mhloyi's have not produced sufficient evidence to establish their equal protection <u>Monell</u> custom claim against the City.

Moreover, the Mhloyis have not provided record evidence supporting a reasonable inference that any policy- or decision-maker within the Coatesville police department or the City's administration was aware of, and acquiesced to, a well-settled

custom of treating JB's Web, or the Mhloyis, differently than other establishments within the City.  For this additional reason, the Mhloyi's have not produced sufficient evidence to establish their equal protection <u>Monell</u> custom claim against the City. <u>See</u> <u>Watson</u>, 478 F.3d at 156 (quoting <u>Bielevicz</u>, 915 F.2d at 850).

## **CONCLUSION**

For the reasons discussed above, I grant the within motion and enter judgment in favor of the moving defendants and against the Mhloyi plaintiffs.

Specifically, I grant the within motion and enter judgment in favor of the Officer defendants because the Mhloyi plaintiffs have not produced sufficient record evidence to permit a reasonable juror to conclude that each of the Officer defendants treated the Mhloyi or JB's Web differently than a similarly situated owner or establishment, or that any such treatment was based upon racial animus.

Additionally, I grant the within motion and enter judgment in favor of the City because the Mhloyi plaintiffs have not produced sufficient record evidence demonstrating that (a) an official policy or custom of the City caused a violation of the Mhloyis' rights to equal protection of the laws; and (b) any decision- or policy-maker within the Coatesville police department or the City's administration was aware of, and

acquiesced to, any such policy or custom, so as to provide a basis for municipal liability against the City.

Accordingly, the sole remaining parties in this lawsuit are plaintiff Ronnie Suber and defendant Jon Guinta.  The sole remaining claims are plaintiff Suber's claims against defendant Guinta for violation of plaintiff Suber's First, Fourth, and Fourteenth Amendment rights, brought pursuant to 42 U.S.C. §§ 1983 and 1985.